Thank you, Your Honor. And may it please the court, Brian Talcott for the appellants. We're here today asking this court to reverse the district court's summary judgment grant in favor of the Port of Vancouver on its breach of contract claim on the basis that there are issues of material factor trial. Now, those issues of material factor roughly break down into two categories. First is what I would characterize as liability, and required appellants to, and I'm going to refer to Metro Metals, there are two appellants here, but they can be treated as one and the same. Whether the contract required Metro Metals to perform in the way that the court urges. The second category is with respect to damages. I'm going to start with the damages issue. And I don't think there's really a dispute about the legal issue here. The court had to prove that there were damages approximately resulting from the alleged breach of contract. And the court had to prove those damages with reasonable certainty and damages issues generally under Washington law. There's no dispute. This is a Washington state law case. Those damages generally create a jury question. Now, whether there has been a breach that's led to damages has to be measured by the terms of the contract. And here the allegation is that the caused by its scrap steel operations, repair damages to the port's concrete dock. And so the question is, was there an issue of fact with respect to a failure to repair damages caused by those scrap steel operations? In the record, you will see a declaration and report from Metro Metals expert, Kevin McCormick, an engineer, and that declaration wasn't challenged for qualification purposes or anything else. And in that declaration, Mr McCormick opines that there were large parts of good and undamaged concrete that were replaced as part of the repair that the court undertook. In fact, he says the port repaired 85% of the dock surface that didn't appear to have significant damage to it and that the cost of repair as a result that the court incurred was far greater than what was necessary to repair damages that were caused by the scrap steel operation. What's the benchmark? What does initial condition mean? Well, and I was going to get to that, but I'll jump ahead. I mean, we've obviously raised in our argument about the light. But is that relevant to the damage? What's the benchmark for assessing how much repair they got to make? The court contends that initial condition means essentially a pristine dock. But if you look at the contract language, it says initial condition of the damaged areas. And so even if you accept the proposition that initial condition unambiguously means like new, as the court argues, you're still only talking about the damaged areas and not a like new dock, which is what the court continuously argues in its brief argued in the district court. So if the benchmark is like new, and we don't agree that the contract unambiguously says that, but if that is what the benchmark is, it's still only with reference to those areas that were damaged. And because Mr McCormick's declaration recorder in the record saying that a related patient was damaged, that's sort of a classic fact issue that we're hearing inside. So on the damages issue, there's a material issue of fact about what the damages were, even if you buy the court's argument about what the contract means. I'm going to move on to... Can I just ask, though, just so I'm absolutely clear on this, I'm not asking you to concede liability, but you're not saying that there aren't some damages involved? I don't think there's been an issue. That's correct. I think there are damages to the dock surface. Now, the work that's done out there is performed by longshore workers and so forth, so there may be issues about who's ultimately responsible for the damage, but there isn't a dispute that there's damage to the dock surface that took place from the scrap steel operations. Who is responsible for that aside? Moving on to the question of liability in the contract, we sort of broke that down in our brief into what I called the fact over the spatial issues versus the temporal issues. By the spatial issues, and I'm going to focus on that with the limited time that I have, what we're talking about is whether the court contends that the agreement imposed an obligation to the concrete dock surface. Now, the Metro Metals performed operations adjacent to the dock, and its view is that the contract was limited to those operations, which we call the shred berm area. I think here it's important to note the Washington Supreme Court's case Byrd versus Huthman, where the court rejects the sort of playing language contract interpretation analysis in favor of one that considers extrinsic evidence when it shows objective manifestations of intent. And the reason I think the Washington Supreme Court does that is because English language is inherently malleable, and you can always say something is ambiguous or unambiguous and apply different meanings to it. And likewise, parties often draft contracts with imprecision, and so you have to dig deeper to figure out whether contract language that might appear unambiguous on its choice. Here, the court's argument in essence is that this repair provision, which says repair damages to terminal areas caused by scrap steel operations, is unambiguous on its face, because these are damages, they were caused by scrap steel operations, and the dock is part of the terminal. And that is initially maybe and glibly an appealing argument, but you have to look deeper here. Beginning with the context of the called Exhibit 2 to the agreement that lists, and it's the only place in the agreement that talks about concrete at all, never mind there's no mention of the dock, and that exhibit lists repairs to existing asphalt and concrete in a $90,000 cost estimate. Well, the court says that doesn't apply here unambiguously, that applies only to work that was being done in connection with the berm area. The district court actually looked at that, and that was part of the district court's basis, finding that this contract provision created an unambiguous requirement to repair the whole dock. So the fact that the district court and the court don't even see eye to eye on that issue, I think, expresses the ambiguity here. How is that helpful to you? The fact that Exhibit 2 says repair existing concrete and asphalt services damaged by shred activities, wouldn't that suggest that the first bullet under Metro Metals Responsibilities refers to something else, some future obligation to make repairs? Well, I don't read it that way. I think at minimum, it's ambiguous on that point, because it says... Well, no. I mean, if they refer to the same thing, then it's redundant, and even in Washington contract law, you don't read a contract so that one provision is completely superfluous. And if those refer to the same thing, then that's... So the first one has to refer to something other than a repair. How I'd respond to that, Your Honor, is it appears that Exhibit 2 is sort of a detailed breakdown of tasks that are more specific than what's listed in the general two and a half page letter agreement, along with accompanying cost estimates. And those cost estimates evolve over time. But there's no cross reference between that paragraph in Exhibit 2. The cross reference occurs later in the list. It does, but I would submit that only creates more ambiguity, because there are duplications of tasks that are specifically listed in the two and a half page agreement that aren't cross referenced, that are also listed on Exhibit, and we've laid those out in the brief. Council, what do you do with the third bullet under Metro's responsibilities, the one that says repair port areas damaged by tract equipment? Does that not correlate with the $90,000 estimate in Exhibit 2? Again, what the party's intended by that, I think, is ambiguous on its face, because repairing areas damaged by tract equipment, is that on the list? What does this contract mean just on the face of the agreement? But if you look at the extrinsic evidence, I don't have time to go into it now. There's never any discussion or negotiation of assumption of broad obligation to repair the dock. In fact, it sort of looks like this was something that the court came up with. I only have 15 seconds left. I'll reserve whatever time I have for rebuttal. I'll give you two minutes for rebuttal, and we'll hear now from Ms. Tanner. Good morning. May it please the court. Molly Henry on behalf of the Court of Vancouver. This case presents a straightforward contract interpretation question, which is, what did the parties intend when Metro agreed to repair damage to the terminal areas used for scrap steel operations? The parties dispute whether this provision required Metro to repair damage that its scrap operations caused to the court's concrete dock after signing the agreement in 2009. The court asks that this court affirm summary judgment for all the reasons set forth in our brief. But unless the court directs otherwise, I planned to focus my argument today on three issues. First, in light of the language and the phrase terminal areas used for scrap steel operations can only reasonably be read to include the concrete dock, which Metro used for heavy melting scrap or HMS operations. Second, the term repair, when read in conjunction with the whole agreement, unambiguously requires Metro to repair all damage that it may cause to the terminal through its expanded operations that were contemplated under the agreement. And finally, under Washington law, the court was entitled to be reimbursed for amounts it actually incurred to repair the dock back to its initial condition. Because the parties disputed the measure of damages and not the amounts the court actually incurred, this was properly decided on summary judgment as a matter of law. On the issue of liability, on the first two bullets for Metro Metal's responsibilities, does your reading of the first one make the second one superfluous? Because if repair damage to the terminal areas used for steel scrap operations applies to all of the areas, then what's the point of the second bullet about asphalt repair? The Metro's second bulleted obligation under the agreement to provide initially and in the future is an entirely separate obligation under Metro Metal's responsibilities. And they're not comparable terms. There was a need at asphalt at the time of the agreement in 2009 in order to protect the large scrap area from future damage in anticipation of the uptick in operations. So the asphalt would need to be relayed as Metro's operations inevitably wore it down. It's referred to in the record as a sacrificial layer. As a result, the asphalt provision needed to be made clear that it was not just a one-time thing. Asphalt needed to be re-added over time to minimize, or better yet, avoid future damage to the... But is that a form of repair? It's a sacrificial layer. It's not a repair. It's a protective layer. There was no similar need to make initial repairs to the new operations area that Metro was moving into in 2009, much of which had never really been used before their expansion. So there was no need to include that initial language. But you just pointed out that the second bullet has a temporal aspect to it, and that was important to add. Why isn't there a temporal aspect in the first bullet if it has a similar temporal meaning in your reading? The asphalt provision needed to be made clear that it was not a one-time thing. It had to be added at the beginning, and then it needed to be added on an as-needed basis going forward in the future. But there was no similar need to make initial repairs to the operations, to the new operational areas, because those had never really been used, and there's no evidence that they had damage in 2009 repairs. So one way to think of it is that the asphalt provision required both immediate and ongoing concrete action. Pardon the pun. Concrete in a different sense. And the repair provision... I'm sorry to put it on, but can I ask... I just want to be clear about the timeline. Sure. Looking at the context, in 2009, when this agreement was signed, do I recall that Metro Metals had already made the transition into processing heavy melting scrap? That's correct, Jeroen. So it's not as if after 2009, we go into a new line of business, or into two-dimensional work? That's correct. Metro began using the dock in 2007 to export some heavy melting scrap. So it was known by the parties at the time they entered into this agreement in 2009 that Metro was using both the berm area for its shred and the dock for its heavy melting scrap. But I'm sure that they would have been aware that they were causing more damage. Yes, although the records... I'm sorry, I didn't mean to interrupt you, Honor. No, that's what would have been the case when they were simply in the light scrap. Yes. Had there been damage to the dock at the time of the 2009 agreement, that would have been needed to be repaired, likely under the Exhibit 2, which covered repairs for existing damage. But the fact of the record is there's no evidence that there was any damage that needed to be repaired in 2009 when this agreement... to the concrete dock in 2009 when this agreement was entered into. And that makes sense in context when you consider that the whole point of this agreement was to increase Metro's operations on the dock. And following execution of this agreement, in the two years in which this damage really occurred following the agreement, that's when its HMS exports and its shred exports nearly doubled. And that's when you start getting the ILWU complaints about damage to the dock. And that's when we needed to step in and deal with this repair situation. Counselor, your time is going quickly. Would you turn to the damages question? I sure will. I think the issue with respect to damages is properly framed as a dispute over the measure of damages for the breach of the repair provision. In other words, was the port entitled to a dock in its initial condition, or was Metro only required to repair the specific spots that it damaged without regard to whether those specific repairs restored the dock back to its initial structural capacity? And that's a question... Counselors, I think there's some additional questions. I mean, as I read the McCormick filing, part of the accusation is this was... You ended up with a better dock than what you started with. And that's terrific for the port. Congratulations. But maybe that's not what their obligation was under this contract. And I don't know how we resolve that question on this record. So I think I would phrase Metro's arguments a little differently. I think the first argument they're making out of the box is that rather than doing this holistic repair, we ought to have just done patchwork repairs to what I'll refer to as sort of the potholes on the dock, where there was a vast need to fill in the potholes. And the problem with that scope of repairs is that it didn't address what KPFF described as rough wear. The wearing that happened to concrete across the entire surface of the dock. So those targeted repairs don't address the uneven surface of the dock. And Metro's expert, McCormick, conceded that even if his targeted repairs were possible, it would still require the dock surface to be leveled up. That's at supplemental efforts of record 42 to 43. So just to finish up that thought, he went on to explain that their targeted repair suggestion and the port's repairs that actually restored the dock back to its initial condition, those aren't apples-to-apples comparisons. The apples-to-apples is McCormick's own words. They also make two arguments that I would put into the bucket of, you gave yourself a better dock. One of those is that the port fixed wear and tear, purported wear and tear. And I would point out, first of all, that the benchmark for what the port was entitled to is the dock in its initial condition. There was no discount in the agreement itself for wear and tear, which really consists of things like tire marks, dirt, and the occasional equipment scrape. No repairs are required for wear and tear, and there's no evidence that the port spent more money on repairs because of wear and tear. And in fact, there's evidence in the record that's undisputed that neighboring docks that are also 12 years old, just like T2V2, are in like-new condition despite normal wear and tear. And their last argument that we got a better dock really relates to this micro-silica versus concrete. And I think that argument can only be categorized as a red herring because McCormick, Metro's own expert, testified that the cost of the micro-silica was negligible, and he didn't even include it in his own estimates. So the evidence is really undisputed that micro-silica was necessary for the repair rather than a bill because it adhered much to the existing policy. Okay, what do we do with statements? And I'm looking at ER 178 as part of the McCormick declaration that the amount of damage that can be attributed to it, meaning to Metro Metals PCS, is significantly less than the scope of the work performed by the port in 2012. So he says there was damage, but the amount of damage that can be attributed to them is much less. And he's itemized things. I mean, how do we say that that's reasonably ascertainable on this record without the assistance of a jury? Because what McCormick is putting a price tag on is not a dock in its initial condition, which is what the port was required, entitled to, excuse me, under the terms of the agreement that it signed. So unless the court has any further questions, we ask that you affirm summary judgment. Thank you. Thank you. Two minutes on the clock for rebuttal from Mr. Kelly. Thank you. I want to touch briefly on one issue with respect to the liability side, and that is the idea that there was no damage to the dock or evidence of damage to the dock prior to the time this agreement was inked. And that's just simply incorrect. The port's own representative, Todd Kraut, submitted a declaration into DR 395 where he discusses identifying damage from the HMS operations in 2007. So again, the notion that existing versus initially and in the future, as you see in the agreement, is unambiguous somehow just doesn't make sense. I want to turn back to the issue about repairs. And again, I think it's very important to look at the contract language that the port is seeking to enforce. It doesn't say that they get a new dock in its initial condition. It says that the damaged areas, the portal developed a scope of repair of the damaged areas based on initial condition. You have the McCormick declaration here that very clearly says that not all the areas where money was spent to build up the concrete were repairs of damaged areas. And because of that, you've got a classic jury issue that a jury needs to resolve. Now, this notion that there are issues with Mr. McCormick's declaration, we always have those issues with experts. Those are credibility issues, and those are the kinds of arguments that counsel can make to a jury in this case to explain why the jury should believe the court's damage amount as opposed to the one that Mr. McCormick proffered. But that is not an issue for the district court to decide, and it's not one for this court to decide. But for that reason, we ask the court to reverse the trial or support the judgment and this case for trial. Thank you. Thank you. The case just started to be submitted. Thank counsel for their helpful arguments on this matter.
judges: Bybee, Stearns, Collins